# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

DENISE M.,[1]

                                Plaintiff,

v.

                                                    Case No. 3:23-cv-00155-SLG

MARTIN J. O'MALLEY,[2]
Commissioner of the Social Security Administration,

                                Defendant.

## DECISION AND ORDER

On or about June 18, 2019, Denise M. ("Plaintiff") protectively filed applications

under Titles II and XVI of the Social Security Act,[3] with an alleged onset date of April 23,

2019.[4]  Plaintiff has exhausted her administrative remedies and filed a Complaint seeking

---

[1] Plaintiff's name is partially redacted in accordance with Fed. R. Civ. P. 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Martin J. O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[3] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time.  Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Plaintiff brought claims under Title II and Title XVI.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs.  *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  For convenience, the Court cites the regulations governing disability determinations under both titles.

[4] Administrative Record ("A.R.") A.R. 39, 290, 297.  The application summaries, not the applications themselves, appear in the Court's record and are dated July 15, 2019.  A.R. 290, 297.  Pursuant to 20 C.F.R. §§ 416.340-350, a protective filing date establishes the earliest

relief from this Court.[5]  Plaintiff's Opening Brief asks the Court to reverse and remand the agency's decision for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).[6]  The Commissioner filed the Administrative Record as his Answer and a Response Brief.[7]  Plaintiff filed a Reply Brief.[8]

Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[9]  For the reasons discussed below, Plaintiff's request for relief at Docket 11 is GRANTED.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[10] "Substantial evidence" has been defined by the United States Supreme Court as "such

---

possible application date based on a claimant's oral inquiry about eligibility or a verbal or written statement of intent to file for benefits.  Therefore, June 18, 2019, is considered Plaintiff's application filing date.  *See* A.R. 39.

[5] Docket 1 (Plaintiff's Compl.).

[6] Docket 11 (Plaintiff's Br.).

[7] Docket 9 (Notice of Lodging Admin. Record); Docket 14 (Commissioner's Br.).  As of December 1, 2022, the Commissioner's "answer may be limited to a certified copy of the administrative record."  *See* Fed. R. Civ. P., Supp. R. 4(b) of Soc. Sec. Actions under 42 U.S.C. § 405(g) (effective Dec. 1, 2022).

[8] Docket 15 (Reply).

[9] 42 U.S.C. § 405(g).

[10] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

Case No. 3:23-cv-00155-SLG, *Denise M. v. O'Malley*
Decision and Order
Page 2 of 37

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[12]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[13]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[15]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[17]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the

---

[11] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

[12] *Id.*; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation omitted).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotations and citations omitted).

[17] *Celaya v. Halter,* 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)).

claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[18] However, this duty exists "even when the claimant is represented by counsel."[19]

## II. DETERMINING DISABILITY

The Social Security Act ("the Act") provides for the payment of disability insurance benefits ("DIB") to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[20]  In addition, Supplemental Security Income ("SSI") may be available to individuals who do not have insured status under the Act but who are age 65 or older, blind, or disabled.[21]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[22]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in

---

[18] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (citations omitted).

[19] *Mayes v. Massanari,* 276 F.3d 453, 459 (9th Cir. 2001) (citations omitted).

[20] 42 U.S.C. § 423(a).

[21] 42 U.S.C. § 1381a.

[22] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

significant numbers either in the region where such individual lives or in several regions of the country.[23]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[24] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[25] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[26] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[27] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity" ("SGA").[28] *The ALJ determined that Plaintiff had not engaged in SGA since April 23, 2019, the alleged onset date. The ALJ also determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2024.* [29]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical

---

[23] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[24] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[25] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[26] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098.

[27] *Tackett*, 180 F.3d at 1101 (emphasis in original).

[28] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[29] A.R. 28.

or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[30] *The ALJ determined that Plaintiff had the following severe impairments: cervical spine disorder; degenerative joint disease of the hands, sacroiliac (SI) joints, knees, and left foot; obesity; obstructive sleep apnea; and fibromyalgia. The ALJ determined that Plaintiff's diabetes mellitus, type II; hypothyroidism; gastroesophageal reflux disease (GERD); irritable bowel syndrome; acute cystitis; and anxiety; were non-severe impairments.[31]* There is no reference to complex regional pain syndrome ("CRPS") at step two.

**Step 3.** Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[32] *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[33]*

---

[30] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[31] A.R. 29.

[32] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[33] A.R. 30.

Residual Functional Capacity.  Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.[34]  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[35]  *The ALJ determined that Plaintiff had the residual functional capacity to perform light work with the following limitations: standing/walking for up to six hours and sitting for up to six hours in an eight-hour workday with normal breaks; occasionally climbing stairs and ramps; never climbing ladders, ropes, and scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; frequently handling and fingering bilaterally; avoiding moderate exposure to respiratory irritants and the operational control of moving machinery; and all exposure to unprotected heights and hazardous machinery.[36]*

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[37]  Otherwise, the evaluation process moves to the fifth and final step.[38]  *The ALJ determined*

---

[34] 20 C.F.R. §§ 404.1545(a), 416.945(a).

[35] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[36] A.R. 32.

[37] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[38] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

*that Plaintiff was able to perform her past relevant work as a credit clerk (DOT # 205.367-22, sedentary, SVP 4) and customer service representative (DOT # 249.362-26, sedentary, SVP 4).*[39]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[40] *The ALJ did not reach step five in her analysis.*[41]

The ALJ concluded that Plaintiff was not disabled at any time from April 23, 2019, the alleged onset date, through July 5, 2022, the date of the ALJ's decision.[42]

## III. PROCEDURAL BACKGROUND

Plaintiff was considered an individual of advanced age (age 55–59) on the alleged onset date. She subsequently changed age categories to closely approaching retirement age (age 60+).[43] Her past relevant work included work as a credit clerk, a customer service representative, a cashier, and a mortgage assistant.[44]

---

[39] A.R. 38.

[40] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[41] A.R. 38–39.

[42] A.R. 39.

[43] A.R. 114. *See* 20 C.F.R. §§ 404.1563, 416.963.

[44] A.R. 335.

In her application, Plaintiff alleged disability due to lupus, fibromyalgia, vertigo, migraines, and osteoarthritis.[45] Her claims were denied at the initial level on January 23, 2020.[46] On April 7, 2021, she appeared and testified unrepresented by telephone before the assigned ALJ.[47] On May 26, 2021, the ALJ issued an unfavorable ruling.[48] The Appeals Council vacated the hearing decision and remanded the case back to the ALJ on December 20, 2021. Specifically, the Appeals Council remanded because the additional evidence submitted by Plaintiff after the hearing was new, material, and related to the period at issue. The Appeals Council determined that the additional evidence had a reasonable probability of changing the outcome of the decision "because it suggests the claimant may be limited to occasional fingering during the period at issue." The Appeals Council noted that the ALJ found that a limitation of occasional fingering would preclude Plaintiff's past jobs. The Appeals Council also noted that the additional evidence showed that Plaintiff consistently used a cane.[49]

On April 12, 2022, Plaintiff appeared and testified by telephone with representation before the same ALJ at a hearing after remand.[50] On July 5, 2022, the ALJ issued a

---

[45] A.R. 114.

[46] A.R. 138–39.

[47] A.R. 81–102. The ALJ notified Plaintiff that she was conducting the hearing via telephone "due to community measures to stop the spread of the virus, COVID-19." A.R. 81.

[48] A.R. 143–54.

[49] A.R. 160–62.

[50] A.R. 50–67. The ALJ notified Plaintiff again that she was conducting the hearing via telephone "due to community measures to stop the spread of the virus, COVID-19." A.R. 50.

second unfavorable ruling.[51]  The Appeals Council denied review on May 9, 2023.[52]  On

July 11, 2023, Plaintiff timely appealed to this Court.[53]

## IV.    DISCUSSION

Plaintiff is represented by counsel in this appeal.  Plaintiff alleges that the ALJ: (1)

failed to adequately consider Plaintiff's complex regional pain syndrome ("CRPS") under

Social Security Ruling ("SSR") 03-02p and Plaintiff's fibromyalgia under SSR 12-2p when

evaluating Plaintiff's subjective pain complaints, and (2) failed to properly analyze the

medical opinions of Plaintiff's treating providers, Summer Engler, M.D., Rachel Spillman,

P.T., and Dudley Babb, D.P.T.[54]  The Commissioner disagrees and asks the Court to affirm

the ALJ's decision.[55]

## A.    SSR 12-2p and SSR 03-2p

Plaintiff alleges that the ALJ's minimal consideration of Plaintiff's severe

impairment of fibromyalgia under SSR 12-2p and the ALJ's failure to discuss Plaintiff's

CRPS under SSR 03-2p constituted reversible error.[56]  Specifically, she asserts that

because CRPS and fibromyalgia "are legitimate explanations for Plaintiff's pain and

---

[51] A.R. 25–39.

[52] A.R. 1–6.

[53] *See* Docket 1.

[54] Docket 11 at 10–24.

[55] Docket 14 at 2–9.

[56] Docket 11 at 15–16.

related limitations," the ALJ failed to adequately evaluate Plaintiff's symptom complaints.[57]

### 1. *Fibromyalgia and SSR 12-2p*

"Fibromyalgia is 'a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue.'"[58] "Typical symptoms 'include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue.'"[59] SSR 12-2p provides guidance on how to establish fibromyalgia as a medically determinable impairment.[60] Here, the ALJ found Plaintiff's fibromyalgia to be a severe, medically determinable impairment.[61] SSR 12-2p also explains how the Social Security Administration evaluates fibromyalgia disability claims.[62]

As stated by the Commissioner, claims involving fibromyalgia and CRPS are evaluated using the same five-step process "[a]s with any adult claim for disability benefits," and the residential functional capacity assessment must be based "on all relevant evidence in the case record."[63] However, the Ninth Circuit has specified that "[i]n

---

[57] Docket 11 at 15–16.

[58] *Revels v. Berryhill,* 874 F.3d 648, 656 (9th Cir. 2017) (quoting *Benecke v. Barnhart,* 379 F.3d 587, 589 (9th Cir. 2004)).

[59] Id. (quoting *Benecke*, 379 F.3d at 590).

[60] Titles II and XVI: Evaluation Of Fibromyalgia, SSR 12-2p, 2012 WL 3104869, at *1 (S.S.A. July 25, 2012).

[61] A.R. 28.

[62] 2012 WL 3104869, at *1.

[63] Docket 14 at 5–6 (citing 2012 WL 3104869, at *5–6).

evaluating whether a claimant's residual functional capacity renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods, as described in SSR 12-2p and *Benecke*. The failure to do so is error[.]"[64] Moreover, in the Ninth Circuit, SSRs are binding on ALJs.[65]

Pursuant to SSR 12-2p, the ALJ is required to "consider the longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" The ALJ is also required to account for "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue" at steps four and five in the sequential disability analysis. Pain and other symptoms may also require exertional and nonexertional limitations that prevent a claimant from doing the full range of unskilled work and/or erode the claimant's occupational base.[66]

For the reasons set forth below, the ALJ erred by failing to construe Plaintiff's symptom testimony and reports in light of fibromyalgia's unique symptoms and diagnostic methods.

2.      *CRPS and SSR 03-2p*

Plaintiff alleges that the ALJ's lack of discussion of her CRPS diagnosis pursuant to SSR 03-2p was harmful error, requiring remand.[67] The Commissioner counters that

---

[64] *Revels,* 874 F.3d at 662.

[65] *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1224 (9th Cir. 2009) ("SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless.").

[66] 2012 WL 3104869, at *6.

[67] Docket 11 at 16.

the ALJ "did not agree that CRPS was one of Plaintiff's medically determinable impairments" and asserts that Plaintiff did not directly challenge this finding.[68]

At step two in the sequential disability evaluation, the claimant bears the burden of demonstrating a medically severe impairment or combination of impairments.[69] At this step, every impairment is "severe" unless the medical evidence "clearly establishe[s]" a "slight abnormality that has no more than a minimal effect on an individual's ability to work."[70] However, failure to include an impairment at step two is harmless error if the ALJ considers the limitations imposed by the impairment at a later step.[71]

SSR 03-2p defines Complex Regional Pain Syndrome ("CRPS") as a chronic pain syndrome "most often resulting from trauma to a single extremity." It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger . . . CRPS."[72] SSR 03-2p also explains the Social Security Administration's policies for "developing and evaluating" claims for disability due to CRPS. It describes CRPS as a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings. SSR 03-2p specifies that CRPS may be the basis for a finding of disability. However, conflicting evidence in the medical record is not

---

[68] Docket 14 at 5.

[69] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(iii).

[70] *Webb v. Barnhart,* 433 F.3d 683, 686-87 (9th Cir. 2005) (alterations omitted).

[71] *Lewis v. Astrue,* 498 F.3d 909, 911 (9th Cir. 2007) (finding step two error harmless when the "ALJ extensively discussed [claimant's] bursitis at Step 4 of the analysis.").

[72] Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome, SSR 03-2p, 2003 WL 22399117, at *1 (S.S.A. Oct. 20, 2023).

unusual "due to the transitory nature" of the objective findings and complicated diagnostic process for CRPS.  Therefore, ALJs should first seek out a claimant's treating or other medical sources to clarify conflicts in the medical evidence.  Moreover, SSR 03-2p notes that when evaluating duration and severity, as well as formulating the RFC, the ALJ must carefully consider the effects of chronic pain and the use of pain medications.[73]

An ALJ is not required to discuss a diagnosis if the effect on the claimant's functional limitations is not explained.[74]  Moreover, the failure to include CRPS at step two may not be harmful error so long as the ALJ discusses all of the limitations associated with Plaintiff's CRPS.[75]  And the failure to cite SSR 03-2p is not error, of itself, so long as the ALJ's evaluation follows SSR 03-2p's guidelines.[76]

Here, the ALJ's decision does not mention SSR 03-2p or Plaintiff's CRPS diagnosis despite Plaintiff's treating physician's diagnosis and evidence of treatment for CRPS in the medical record.[77]  And as discussed below, in addition to the CRPS diagnosis by Dr. Liu, a pain specialist, the treatment record documents ongoing treatment for CRPS and PT Spillman's opinion contains functional limitations resulting from Plaintiff's CRPS,

---

[73] *See* SSR 03-2p, 2003 WL 22399117.

[74] *Somogyi v. Berryhill,* No. CV 16-8819-AFM, 2018 WL 1135423, at *2 (Feb. 27, 2018) (collecting cases).

[75] *See Teresa Marie B. v. O'Malley,* 2024 WL 2978636, at *4 (June 13, 2024) (finding the failure to identify CRPS at step two or discuss CRPS in the decision and failure to apply SSR 03-2p was error)

[76] *Carrillo v. Kijakazi,* No. 1:21-cv-01211-SKO, 2023 WL 131125, at *7 (E.D. Cal. Jan. 9, 2023) (citation omitted) (finding the failure to cite SSR 03-2p is not error, so long as the ALJ's evaluation "comport[s] with the guidelines set forth in SSR 03-2p.").

[77] A.R. 25–39.

primarily in the hands.  Therefore, it was error for the ALJ to ignore the unique symptoms of CRPS and the SSA's guidance provided in SSR 03-2p.[78]

## B.    Plaintiff's Symptom Testimony and Reports

At the hearing after remand on April 12, 2022, Plaintiff testified that her primary impairments were pain and side effects from medication.  She indicated that her pain was "all over," but mainly in her back, feet, neck, and hands.  She testified that her hands were swollen and she had two "crooked" fingers.  Plaintiff indicated that her hands were very stiff in the morning and at night after activity.   She testified that her hand pain started to become a problem in 2020 and "ha[s] been going downhill since then[.]"  She stated that she had problems dressing and doing things around the house because of her hands and that she could not grip objects or use a cellphone.   Plaintiff testified that her rheumatologist and pain specialist had not "found something that actually works yet" for her pain.

_____

[78] *See Carrillo,* at *7, *citing Pettingill v. Saul,* No. 2:18-CV-2979-EFB, 2020 WL 2404616, at *6 (E.D. Cal. May 12, 2020) (finding the ALJ erred in failing to evaluate the plaintiff's CRPS under SSR 03-2p where the evaluation was "based on cherry-picking only notations reflecting a positive response to medication" while "ignor[ing] the portions of the same medical records reflecting ongoing pain that impaired plaintiff's ability to perform daily activities"); *Parks v. Berryhill,* No. 1:15-CV-01603-BAM, 2017 WL 908616, at *7 (E.D. Cal. Mar. 8, 2017) ("[I]t was error for the ALJ to ignore the [ ] CRPS diagnos[is] and the objective evidence supporting [it] in light of SSR 03–02p.") (citing *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir. 1984) (An ALJ may not "reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result.")). *See also Taffy D. v. Comm'r of Soc. Sec.,* No. C21-5146-MLP, 2021 WL 4988717, at *3 (W.D. Wash. Oct. 27, 2021); ("[N]ormal lower extremity strength and sensation . . . is not inconsistent with CRPS per SSR 03-2p, as objective findings of CRPS are of a 'transitory nature[.]'") (quoting SSR 03-2p at *4–5)); *Deborah M. v. Berryhill,* No. 19-cv-01901-DMR, 2020 WL 7625483, at *6 (N.D. Cal. Dec. 22, 2020) ("Because clinical findings are of limited value with respect to CRPS, SSR 03-2p emphasizes that the severity of the disorder can be assessed instead through 'a longitudinal clinical record containing detailed medical observations, treatment, the individual's response to treatment, complications of treatment, and a detailed description of how the impairment limits the individual's ability to function and perform or sustain work activity over time.'") (quoting SSR 03-2p at *5)).

###### 1. Legal Standards

An ALJ's assessment of a claimant's symptoms has two steps.[79]  First, the ALJ determines whether the claimant has presented "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[80]  In the first step, the claimant need not "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.  Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof."[81]

Second, if the claimant has satisfied step one and the ALJ has determined that the claimant is not malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. This standard is "the most demanding required in Social Security cases."[82]  Yet, this does not mean an ALJ is required to "simply accept a claimant's subjective symptom testimony notwithstanding inconsistencies between that testimony and the other objective medical evidence in the record, allowing a claimant's subjective evidence to effectively trump all other evidence in a case."[83]

---

[79] *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017), *superseded on other grounds by* 20 C.F.R. §404.1502(a).

[80] *Id.* (quoting *Garrison,* 759 F.3d at 1014–15).

[81] *Garrison,* 759 F.3d at 1014 (internal citations and quotations omitted).

[82] *Trevizo,* 871 F.3d at 678.

[83] *Smartt v. Kijakazi,* 53 F. 4th 489, 499 (9th Cir. 2022).

In this case, the ALJ determined Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms that Plaintiff described. The ALJ then found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.[84]

Because the ALJ found Plaintiff's underlying impairments severe and cited no evidence of malingering, the ALJ was required to provide specific, clear, and convincing reasons for rejecting Plaintiff's subjective symptom allegations. Here, the ALJ provided the following reasons for discounting Plaintiff's symptom testimony and reports: Plaintiff's pain reports were out of proportion with the imaging in the medical record and the normal findings in her physical examinations; Plaintiff's treatment was routine and conservative, with her symptoms largely controlled; and the conservative treatment was effective.[85]

2. *Plaintiff's Imaging and Physical Examinations*

"When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."[86] Here, the ALJ concluded, "while the imaging in the medical record shows abnormalities, [Plaintiff's] allegations are out of proportion with the findings."[87] The ALJ also discounted Plaintiff's pain and symptom complaints because her physical examinations showed she

---

[84] A.R. 33.

[85] A.R. 33–36.

[86] *Smartt,* 53 F.4th at 498 (collecting cases) (emphasis in original).

[87] A.R. 33.

Case No. 3:23-cv-00155-SLG, *Denise M. v. O'Malley*
Decision and Order
Page 17 of 37

was in no acute or apparent distress and showed good strength or mildly reduced strength, normal range of motion, and normal sensation.[88]

However, as explained in *Revels v. Berryhill,* "[w]hat is unusual about [fibromyalgia] is that those suffering from it have muscle strength, sensory functions, and reflexes that are normal."[89] "Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling."[90] "Indeed, there is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain."[91] "The condition is diagnosed 'entirely on the basis of the patients' reports of pain and other symptoms.'"[92] "[T]here are no laboratory tests to confirm the diagnosis."[93] Symptoms of CRPS include a degree of pain "out of proportion to the severity of the injury sustained by the individual" and do not always "present continuously." SSR 03-02p also warns adjudicators that "[t]ransient findings are characteristic of CRPS[.]"[94] Moreover, recent Ninth Circuit district courts decisions have held that "it is questionable whether a chart note of 'no acute distress' is relevant to allegations of chronic symptoms."[95]

---

[88] A.R. 34–35.

[89] 874 F.3d at 662 (internal quotations and alteration omitted).

[90] *Id.* (internal quotations omitted).

[91] *Id.* (internal quotations and alteration omitted).

[92] *Id.* (*quoting Beneke,* 379 F.3d at 590).

[93] *Id.* (alteration in original) (*quoting Benecke,* 379 F.3d at 590).

[94] 2003 WL 22399117, at *1.

[95] *See e.g., Troy A.H. v. Comm'r of Soc. Sec.,* Case No. 6:20-cv-01228-YY, 2022 WL 336846, at *5 (D. Or. Feb. 4, 2022); *Mitchell v. Saul,* Case No. 2:18-cv-01501-GMN-WGC, 2020 WL 1017907, at *7 (D. Nev. Feb. 13, 2020) ("Moreover, the court agrees with Plaintiff that notations

Here, the longitudinal record shows that Plaintiff was diagnosed with and treated for fibromyalgia, polyarthralgia, and CRPS. Plaintiff initiated care with Denver Arthritis Clinic on or about June 6, 2018.[96] At that appointment and at subsequent appointments, she reported worsened swelling of her fingers, toes, and knees. She reported worsened bilateral foot pains, left knee pain, and chronic neck pain with memory issues.[97] She had x-rays taken of her bilateral hands, bilateral SI joints, bilateral knees, and left foot.[98] She started Cymbalta "to help alleviate some of her mechanical arthralgias."[99] Previously, Plaintiff had an x-ray taken of her cervical spine. In August 2018, she had an MRI of her left knee.[100] On December 19, 2018, Plaintiff underwent left knee surgery.[101]

On March 12, 2019, Plaintiff reported "widespread arthralgias and myalgias."[102] She also reported ongoing headaches, upset stomach, and profound fatigue.[103] Plaintiff

---

that Plaintiff was healthy 'appearing' and in no 'acute' distress do not distract from the findings regarding Plaintiff's chronic conditions."), *report and recommendation adopted sub nom. Mitchell v. Berryhill,* 2020 WL 1017899 (D. Nev. Feb. 28, 2020); *Richard F. v. Comm'r of Soc. Sec,* Case No. C19-5220-JCC, 2019 WL 6713375, at *7 (W.D. Wash. Dec. 10, 2019) ("Clinical findings of 'no acute distress' do not undermine Plaintiff's testimony . . . 'Acute' means 'of recent or sudden onset; contrasted with chronic.' Oxford English Dictionary, acute (3d ed. December 2011). Plaintiff's impairments are chronic, not acute.").

[96] A.R. 448.

[97] A.R. 442, 448–52.

[98] A.R. 441.

[99] A.R. 451.

[100] A.R. 445.

[101] A.R. 442.

[102] A.R. 446.

[103] A.R. 442.

was diagnosed with fibromyalgia based on positive tender points and the provider opined that fibromyalgia was "likely to be driving her current symptoms."[104] On July 31, 2020, Plaintiff again met the medical criteria for fibromyalgia and was also assessed with polyarthralgia.[105]

From 2019 through 2022, Plaintiff was treated for fibromyalgia and polyarthralgia. Her symptoms waxed and waned. For example, at some appointments, Plaintiff reported that her fibromyalgia symptoms had improved or were controlled. However, at most of these same appointments, she also reported continued fatigue and pain associated with polyarthralgia.[106] And, the longitudinal record shows that Plaintiff reported constant pain and swelling in multiple joints, including her hands, feet, knees, ankles, low back, hips,

---

[104] A.R. 446.

[105] A.R. 714–15.

[106] *See e.g.,* A.R. 646 (amitriptyline doing well for fibro symptoms with better sleep, headaches, and mood, but swelling and extreme pain in hand and cannot clean self after toileting), 747–48 (fibromyalgia is "much improved since stopping duloxetine and venflaxine," but Plaintiff also reported that she continued to have issues with fatigue and pain), 760 (overall greatly improved fibromyalgia, but still having fatigue and overuse myalgias), 1388–89 (feels much improved, feels much more like herself).

and neck.[107]  Providers often changed her medications in an effort to better manage her

pain.[108]  She reported insomnia, fatigue, and anxiety associated with her pain.[109]

Plaintiff was also diagnosed with and treated for CRPS.  She received  physical

therapy treatment from multiple providers for bilateral hand pain.  On or about July 14,

2020, Plaintiff's physical therapist observed that Plaintiff presented with signs and

symptoms of CRPS .[110]  Plaintiff's pain and dysfunction in the bilateral hands were treated

with physical therapy until Plaintiff wanted to stop focusing on her hands, "as nothing

seems to help."[111]  In July 2021, Luke Liu, M.D., a pain specialist, diagnosed Plaintiff with

---

[107] *See e.g.,* A.R. 594 (continues to be in pain), 603 ("She is having more flare with her fibromyalgia."), 609 (looks better and walked with more ease, but "functionally she is difficult to manage with on going pain, minimal relief and decrease function."), 617 (pain is not controlled), 625–26 (suboptimal control of pain symptoms, but some improvement with Toradol), 632 ("significant distress" and changed medications to better manage and control pain symptoms), 638–39 (poorly controlled polyarthralgia with pain in the AM and very bad swelling in the hand), 646 (poorly controlled polyarthralgia, cannot clean self after toileting, swelling and extreme pain in hand, increase in medications and trial of other medications), 654–55 (chronic, poorly controlled polyarthralgia with loss in range of motion, wrists and hands are in the worst pain and limit function), 663–64 (rheumatoid arthritis involving multiple sites; getting shooting pains into hands, drops things, arthritis/fibro pain much more intense and cause functional decline, unable to grip), 694–95 (continues to have join pain and swelling predominantly in her hands), 703 (bilateral shoulder pain), 730 (continues to have lots of pain and reported fibromyalgia worsening), 736–37 (uncertain if in a flare or if overall disease is worsening, significant issues with sleep, pain in shoulders, knees, and back), 1154–55 (continues to have significant pain), 1327–28 (rheumatoid arthritis flare or worsening fibromyalgia), 1398–99 (reports lots of achy and sometimes nerve shooting pain; stops her from doing most things), 1508 (swelling and joint pain), 1557 (pain after grocery shopping or housework is significant enough to stop Plaintiff from continuing activities, reported pain and swelling in hands and feet), 1562, 1567 (constant pain in multiple joints, pain worst in bilateral hands with swelling, redness, and sensitivity), 1571 (regional pain disproportionate, Complex Regional Pain Syndrome affecting both arms), 1633 (joint swelling in hands, feet, knees and severe left shoulder pain).

[108] *See e.g.,* A.R. 594, 617, 632, 638, 646, 663, 730, 736, 1154, 1327, 1396, 1557, 1637.

[109] *See e.g.,* A.R. 737, 1247, 1328, 1557, 1562.

[110] A.R. 1013–14.

[111] *See e.g.,* A.R. 958–59, 962, 969–71, 976, 979, 1013.

CRPS and administered a stellate ganglion block to her right hand.[112]  She also saw

Gregory Gootee, PA-C, at Dr. Lu's office multiple times. [113]

In sum, Plaintiff's fibromyalgia and CRPS provide context for the medical opinions

and testimony the ALJ found "out of proportion" with Plaintiff's imaging and physical

examinations.

Plaintiff also asserts that the ALJ's analysis of the medical evidence was a lay

analysis and not supported by substantial evidence.[114]  Although an ALJ regularly reviews

medical evidence that was never considered by the agency's reviewing physician, some

courts have found that an ALJ errs when she independently reviews raw medical data

such as complex imaging findings, particularly when there is evidence of progression of

the claimant's impairments.[115]  Here, the Appeals Council specifically found that the new

---

[112] A.R. 1570–72, 1628–29  Plaintiff's rheumatologist, Summer Engler, M.D., opined that she had a "[l]ow suspicion of CRPS" because she was "not aware of tenosynovitis being seen in CRPS." A.R. 1511.  In a subsequent record, Dr. Engler noted that, "Dr. Liu believes [Plaintiff] has CRPS and I need to review his notes."  A.R. 1584.

[113] *E.g.,* A.R. 1557–66.

[114] Docket 11 at 23–24.

[115] *See, e.g.*, *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (finding the ALJ erred in formulating claimant's residual functional capacity based on magnetic resonance images without the benefit of any medical opinion about the functional limitations attributable to the impairments depicted in the images); *Marquez v. Kijakazi*, No. 121CV00205JLTGSA, 2023 WL 3452046, at *5 (E.D. Cal. May 15, 2023), *report and recommendation adopted*, No. 1:21-CV-0205 JLT GSA, 2023 WL 4087828 (E.D. Cal. June 20, 2023) (finding the ALJ erred by independently reviewing x-rays documenting a "fairly significant" worsening of the plaintiff's knee impairment after the non-examining agency physician's review); *Goodman v. Berryhill*, No. 2:17-CV-01228 CKD, 2019 WL 79016, at *5 (E.D. Cal. Jan. 2, 2019) (finding that the ALJ erred in adopting state agency consultants' opinions which were rendered before plaintiff sustained a fall in November 2014 and "did not account for plaintiff's lumbar vertebra fracture, ankle fracture, ankle surgery, and broken rib sustained after their review."); *Stevenson v. Colvin*, No. 2:15-CV-0463-CKD, 2015 WL 6502198, at *4 (E.D. Cal. Oct. 27, 2015) (holding that the ALJ erred in adopting the functionality opinion of a non-examining state agency physician, an opinion which pre-dated "plaintiff's treating

---

evidence submitted after Plaintiff's hearing showed a reasonable probability of changing the outcome of the ALJ's decision. This evidence included x-rays from April 2021 showing "mild-to-moderate first CMC osteoarthritis in the right hand and mild osteoarthritis in the left hand" and a June 2021 MRI of the right hand showing "generalized nonspecific tenosynovitis" and "[s]cattered osteoarthritis." [116]

The Appeals Council directed that the ALJ consider the evidence submitted to the Appeal's Council, obtain additional evidence concerning Plaintiff's physical impairments, and if necessary, obtain evidence from a medical expert "related to the nature and severity of and functional limitations resulting from the claimant's physical impairments." The Appeals Council also directed the ALJ to obtain vocational expert evidence as necessary.[117] Despite the Appeals Council's directives, the ALJ obtained some records but no additional medical or vocational expert testimony. Rather, the ALJ independently reviewed the results of Plaintiff's imaging from September 2020 through January 2022, including the x-rays from April 2021 and MRI from June 2021.[118] Particularly in light of the direction provided by the Appeals Council's order, the ALJ's lay analysis of the objective evidence submitted after the Appeals Council decision, including Plaintiff's April 2021 x-rays and June 2021 MRI, was error.

---

records regarding the progression of his spinal impairments, which were developed after the date of Dr. Pancho's opinion").

[116] A.R. 161, 1522.

[117] A.R. 161–62.

[118] A.R. 33–34. Roy Brown, M.D., the agency's non-examining physician, reviewed Plaintiff's imaging through August 2019 and rendered his RFC determination on January 22, 2020. A.R. 123.

Moreover, the longitudinal record demonstrates that Plaintiff's pain waxed and waned during the relevant period and was accompanied by other fibromyalgia symptoms such as fatigue. Therefore, in light of the unique symptoms and diagnostic methods of fibromyalgia and CRPS, it was error for the ALJ to discount Plaintiff's symptom complaints because her allegations were out of proportion to her imaging and because her physical examinations showing normal strength and range of motion.

### 3. Routine, Conservative Treatment and Effectiveness of Treatment

The amount of treatment is "an important indicator of the intensity and persistence of [a claimant's] symptoms."[119] Therefore, routine, conservative treatment may be used to discount a claimant's subjective complaints regarding her limitations.[120] "[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."[121] But symptom improvement must be evaluated in the context of the "overall diagnostic picture[.]"[122] And, "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce[.]"[123]

Here, the ALJ found that Plaintiff's treatment was "routine and conservative, consisting generally of a combination of [Nonsteroidal Anti-Inflammatory Drug] [(]NSAID[)], opioid, and neuropathic pain medication, along with muscle relaxants" and

---

[119] 20 C.F.R. § 416.929(c)(3).

[120] Parra v. Astrue, 481 F.3d 742, 750–51 (9th Cir. 2007).

[121] Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017).

[122] Holohan, 246 F.3d at 1205.

[123] Garrison, 759 F.3d at 1017 n.23 (internal quotations and citation omitted).

that "this routine treatment was effective, as the claimant reported experiencing overall pain relief."[124]  The ALJ cited three records.  In the cited record from January 9, 2021, Plaintiff reported tolerating an injection of Toradol.  At the same appointment, she reported continued pain in her hands, back, and knee, with crepitus, decreased mobility, and joint tenderness.  The provider noted suboptimal control of Plaintiff's fibromyalgia symptoms.[125]  In the second record, dated March 4, 2021, Plaintiff reported that she continued to be in pain.  She also reported that oxycodone every six to eight hours "helps some," but that she had many neurological and GI side effects.  She asked about trialing another prescription.[126]  In the third cited record from June 30, 2021, Plaintiff reported that NSAIDs did not help; Prednisone "does nothing to help hand pain"; Cymbalta, gabapentin, Lyrica, Tramadol, meloxicam, Toradol, oxycodone, Flexeril, and Celebrex did not help; and amitriptyline helped her sleep.[127]  In sum, these records are not substantial evidence showing that routine, conservative treatment was effective.

The ALJ also pointed to a treatment note from January 2020 indicating that Plaintiff's fibromyalgia symptoms had "greatly improved" with treatment.[128]  However, the medical record as a whole reveals that Plaintiff's symptoms waxed and waned.  She

---

[124] A.R. 34.

[125] A.R. 1200–01.

[126] A.R. 1169–73.

[127] A.R. 1509–11.

[128] A.R. 34.  *See* A.R. 760 (fibromyalgia "overall greatly improved," but "still having fatigue and overuse myalgias").

continued to report pain and swelling, particularly in the bilateral hands.[129]  Similarly, the physical therapy records show that Plaintiff benefited from that  treatment, but also demonstrate that Plaintiff continued to have significant pain and difficulties with her activities of daily living.[130]

---

[129] *See e.g.,* A.R. 1159 (denied fatigue and fever, but "holds arms up in pain"), 1214 (pain is a little better, but in pain in the morning and swelling in hands very bad, meloxicam has not been helping at all and just wants to stop it), 1218 (denied joint pain and muscle weakness, but showed significant hand swelling and reduction in movement on physical examination), 1225–26 (denied joint pain, muscle weakness, and fatigue, but showed bilateral swelling in the hands with stiff joints and was "chronically ill-appearing"), 1508 (PT is helping her regain ROM in shoulders and with her walking, but becoming cost prohibitive and she cannot go as often as she would like to go), 1557 (pain significant enough to stop Plaintiff from continuing activities, pain and swelling in hands and feet), 1586 (pain quite controlled), 1591 (adequate management of pain), 1592 (physical therapy improved condition), 1633 (reported 40-50% better on Humira, but also reported morning stiffness in the hands and unable to ever make a full fist), 1663 (recent flare of left shoulder pain improving with PT, a little improvement of morning swelling and stiffness with Enbrel, but pain is worse).

[130] *E.g.,* A.R. 926 ("hands continue to be significantly painful and dysfunctional, making all ADLs very limited"), 928 (continues to report difficulty with dressing, self-care, cleaning, writing, and other activities), 931 (significant functional disabilities and extremely high levels of pain), 936 (continued significant pain and dysfunction of hands), 944 (has significant functional limitations and continues to report that her hands are the most painful aspect and which significantly limits her function, requested focus on lower extremities because no progress being made with hands), 949 (significant high pain today, could not tolerate many functional activities), 953–54 (reports nothing helps hands, improved ambulation with less pain after taping ankle area), 959 (stop PT for hands to focus on bilateral lower extremities and shoulders), 962 (hands more sensitive today), 966 (hands more sensitive today and took a break from exercises to focus on overall mobility and ambulation), 971, 976, 979 (will benefit from skilled PT to continue treatment for CRPS of bilateral hands and overall function), 984 (continues to display decreased ROM with hands, shoulders and back and decreased strength, impaired gait and balance), 989 (ROM in shoulder is improving), 1002 (continues to improve function), 1005 (able to complete exercises without increase of pain in hands), 1009 (continues to display decreased ROM with her hands, shoulders and back, decreased strength, impaired gait and balance), 1013 (continues to be most limited by her hand pain and dysfunction), 1016 (continues to display flare up of hand dysfunction as well as increase back pain), 1019 (displays decreased functional ability today, difficulty performing peri-care), 1022 (continues to show improvements in her function, as well as decreased swelling of her hands), 1025 (displaying functional improvements, improved gait pattern and gait speed), 1028 (gait training, focus on gentle grip strength), 1031 (improved gait mechanics), 1071–72 (hands continue to be painful and difficulty getting dressed), 1077 (continues to exhibit significant physical impairments that limit her functional ability), 1082, 1087, 1092 (continues to report that her hands are the most painful aspect and which significantly limits her function).

The ALJ's cherry-picked summary of the medical record fails to constitute substantial evidence in the record as a whole that Plaintiff had a good response to treatment or that the routine treatment was effective.

Plaintiff asserts that the ALJ also erred by discounting her pain and symptom testimony because her "need to take opioid pain medication was not reasonably described as 'conservative treatment[.]'" She also asserts that she was compliant with her providers' recommended treatment and that no "invasive treatment" exists for fibromyalgia or CRPS.[131] The Commissioner counters by citing to a recent Ninth Circuit decision, *Smartt,* to assert that "ongoing pain medication, including opioid therapy, constitutes conservative treatment and is therefore sufficient to discount claims of disabling pain."[132] However, unlike *Smartt,* Plaintiff's medical record does not show "both self-reported and objective improvement" with opioid therapy, whether conservative or not.

The failure of a claimant to seek an "aggressive treatment program" permits the inference that symptoms are not "as all-disabling" as the claimant reports.[133] However, "[a]ny evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated."[134]

---

[131] Docket 11 at 20–21.

[132] Docket 14 at 6–7 (internal quotation marks omitted). *See Smartt,* 53 F.4th at 500 ("After Smartt's surgery, the ALJ cited documented evidence of 'conservative treatment,' including physical therapy, temporary use of a neck brace and wheelchair, and ongoing pain medication.").

[133] *Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008).

[134] *Revels v. Berryhill,* 874 F.3d 648, 667 (9th Cir. 2017).

Here, as in *Revels,* the ALJ did not explain why she deemed Plaintiff's pain medications and other treatment "conservative" in the context of fibromyalgia (or CRPS).[135]  Moreover, even if Plaintiff's treatment is routine and conservative in the context of fibromyalgia and CRPS, Plaintiff's pain and symptoms did not significantly improve in a way that contradicts her testimony.  As set forth above, despite adhering to her physical therapy regime and trialing multiple different pain medications, Plaintiff reported pain and functional difficulties on a near-constant basis, particularly in her bilateral hands.  Consequently, the ALJ failed to provide the Court with clear and convincing reasons for discounting Plaintiff's symptom testimony.

## C.  Medical Opinion Evidence

Plaintiff alleges that the ALJ did not evaluate the medical evidence in accordance with SSA authority and Ninth Circuit precedent.  Specifically, she asserts that it was error for the ALJ not to discuss the medical opinion of Plaintiff's treating rheumatologist, Summer Engler, M.D.[136]  She also alleges that the ALJ's evaluation of PT Spillman's and Dr. Babb's medical opinions was not supported by substantial evidence.[137]  Because Plaintiff protectively filed her applications on or about April 23, 2019, the revised regulations governing the evaluation of medical evidence are applicable here.

---

[135] A.R. 34; *see Revels,* 874 F.3d at 667.

[136] Docket 11 at 18.

[137] Docket 11 at 18–23.

## 1.    Legal Standard

Under the revised regulations in effect March 27, 2017, the definition of what constitutes a medical opinion has been narrowed, focusing on what the claimant can do despite her impairments and what work-related limitations are present.[138]  The revised regulations define a medical opinion as follows:

A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:

(i)    Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii)    Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii)    Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv)    Your ability to adapt to environmental conditions, such as temperature or fumes.[139]

The revised regulations further provide that the ALJ no longer gives any particular weight to a medical opinion based on its source, thereby eliminating the treating source rule.[140]  Instead, the ALJ considers the persuasiveness of a medical opinion based on

---

[138] *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1513(a)(2).

[139] 20 C.F.R. § 404.1513(a)(2).

[140] *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844-01 (Jan. 18, 2017), 2017 WL 168819, at *5867–68; 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (for claims filed on or after March 27, 2017).

five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, extent, and type of treatment; (4) specialization; and (5) other relevant factors that support or contradict the medical opinion.[141]

Supportability and consistency are considered the most important factors for evaluating persuasiveness.[142] Supportability and consistency are explained as follows in the regulations:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[143]

Generally, these are the only two factors the ALJ is required to address in her decision.[144] However, when two or more medical opinions or prior administrative medical findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ must explain how "the other most persuasive

---

[141] 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

[142] The regulations state, "The factors of supportability . . . and consistency . . . are the most important factors [the SSA] consider[s] when [the SSA] determine[s] how persuasive [the SSA] find[s] a medical source's medical opinions or prior administrative medical findings to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (for claims filed on or after March 27, 2017).

[143] 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

[144] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.").

factors" were considered.[145]   In the Ninth Circuit, the current regulatory framework no longer requires ALJs to provide "specific and legitimate" or "clear and convincing" reasons for rejecting a treating or examining medical source's opinion.[146]

This Court is confined to reviewing the reasons the ALJ asserts.[147]   An ALJ may discount an opinion that is conclusory, brief, and unsupported by the record as a whole, or by objective medical findings.[148]   And, the consistency of a medical opinion with the treatment notes is a relevant factor in the ALJ's evaluation of that opinion.[149]   However, an ALJ may not "cherry pick" evidence to discount a medical opinion.[150]

> 2.   *Medical Opinion of Summer Engler, M.D.*

On October 22, 2021, Summer Engler, M.D., Plaintiff's treating physician and a board-certified rheumatologist, provided a medical opinion.  Dr. Engler recommended that Plaintiff seek disability "because at this time she cannot work until we figure out how to control her severe disease."  She explained that Plaintiff had "extremely difficult to control bilateral hand tenosynovitis, as well as other peripheral and axial joint inflammatory

---

[145] 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (for claims filed on or after March 27, 2017).

[146] *Woods v. Kijakazi,* 32 F.4th 785, 787 (9th Cir. 2022).

[147] *Brown-Hunter,* 806 F.3d at 494 ("As we have long held, we are constrained to review the reasons the ALJ asserts.") (quotations, citations, and emphasis omitted).

[148] *Batson v. Comm'r of Soc. Sec. Admin.,*359 F.3d 1190, 1195 (9th Cir. 2004).

[149] *See Ghanim v. Colvin,* 763 F.3d 1154, 1161 (9th Cir. 2014); *Orn v. Astrue,* 495 F.3d 625, 634 (9th Cir. 2007).

[150] *Ghanim,* 763 F.3d at 1164.

arthritis symptoms, due to suspected psoriatic arthritis." She also noted that there was a concern for CRPS as well.[151]

"[A]n ALJ errs when [s]he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."[152] At the same time, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that the [ALJ] will determine that [the claimant is] disabled."[153]

Here, Dr. Engler opined that Plaintiff could not work, but she did not provide any functional limitations. Therefore, the ALJ was not required to discuss Dr. Engler's disability opinion. However, Dr. Engler's assessment and treatment notes are evidence in support of Plaintiff's testimony regarding her pain and limitations, particularly her bilateral hand pain.[154]

*3.    Medical Opinion of Rachel Spillman, P.T., D.P.T.*

On March 3, 2021, Rachel Spillman, P.T., D.P.T., completed a physical residual functional capacity assessment. She opined that Plaintiff would be limited to occasionally lifting and carrying less than 10 pounds; standing and/or walking for a total of less than two hours; alternating sitting and standing to relieve pain or discomfort; and limited in her

---

[151] A.R. 1580.

[152] *Garrison,* 759 F.3d at 1012–13.

[153] 20 C.F.R. § 416.927.

[154] *See* A.R. 14, 1508–14, 1580–85.

ability to push and pull with her lower and upper extremities.  PT Spillman explained that Plaintiff's functional limitations were due to Plaintiff's "extreme difficulty utilizing her hands for all functional tests" and CRPS.  She opined that Plaintiff's ability to use hand controls or do computer work was significantly impaired.  She also cited an x-ray report from September 2020[155] showing calcaneal enthesopathy in the right foot and opined that Plaintiff was unable to operate foot controls or drive a vehicle.  PT Spillman noted that Plaintiff was unable to sit for prolonged periods of time before requiring positional changes, due to increased back and lower extremity pain.  She also opined that Plaintiff was limited in her ability to reach in all directions, handle, finger, and feel.  Specifically, PT Spillman explained that Plaintiff had significant limitations reaching with her left shoulder over shoulder height, had a reduced range of motion, and had a reduced ability to grip with her hands.  She also described Plaintiff's decreased sensation throughout the hands, "making any fine motor or fingering tasks (like using a keyboard) severely limited." PT Spillman noted that Plaintiff had been attending physical therapy since May 2020 and "displayed high compliance and participation, to the best of her ability."[156]

The ALJ determined that PT Spillman's medical opinion was unpersuasive.  The ALJ reasoned that neither PT Spillman's treatment notes nor the medical record supported the opinion.  Specifically, the ALJ found that PT Spillman's opinion that Plaintiff had "severe" manipulation limitations was "not defined" by PT Spillman and was not supported by treatment notes, "which rarely mention reduced grip strength and note intact

---

[155] *See* A.R. 1104 (X-ray report indicating "[p]rominent calcaneal enthesopathy particularly at the Achilles insertion").

[156] A.R. 1053–60.

sensation." Although the ALJ included degenerative joint disease of the left foot, she did not list Plaintiff's calcaneal enthesopathy of the right foot as a severe impairment and did not discuss PT Spillman's opinion that Plaintiff was unable to operate foot controls or drive a car due to her right foot impairment. The ALJ discounted PT Spillman's vision limitations and concluded that her environmental limitations were not supported by the record.[157]

As with Plaintiff's testimony, PT Spillman's medical opinion regarding Plaintiff's ability to reach, handle, finger, and feel should be viewed in the context of fibromyalgia and CRPS. Moreover, although Plaintiff's physical therapy notes do not refer to grip strength specifically, they are replete with examples of Plaintiff's bilateral hand pain and dysfunction, as well as her treatment of Plaintiff for difficulties performing activities of daily functioning. At one point, Plaintiff requested that her physical therapist discontinue physical therapy for her hands because she felt "no progress [was] being made with [her] hands."[158] And, other providers observed problems with Plaintiff's grip strength.[159]

In sum, the ALJ's reasons for discounting PT Spillman's medical opinion are not supported by substantial evidence.

---

[157] A.R. 37.

[158] A.R. 944, 953–54.

[159] A.R. 664 (unable to grip), 917 (low grip strength), 936 (inability to grip and pull through towel), 1028 (focus on gentle grip strength), 1030 (instructed on use of wrist strap to decrease pressure through her grip), 1239 (unable to grip), 1307 (grip inconsistencies), 1313 (demonstrated ability to perform simple grasping on an occasional basis), 1570 (decreased grip strength), 1625 (decreased grip strength).

### 4.  Dudley Babb, D.P.T.

On July 13, 2021, Dudley Babb, D.P.T., performed a functional capacity evaluation. Based on a review of Plaintiff's past medical history and records, musculoskeletal testing, observations, subjective pain questionnaires, and other evaluations, PT Babb opined that Plaintiff could perform a reduced range of sedentary work, with the ability to carry 10 or less pounds; stand for one hour and 45 minutes in an eight-hour workday and sit at least two hours at one time; occasionally bending, forward reaching, fine and gross coordination, pinching, simple grasping, and squatting; and avoiding firm grasping.[160]

The ALJ determined that PT Babb's opinion unpersuasive.  The ALJ reasoned that the opinion was not well supported because PT Babb saw Plaintiff only one time, he accepted Plaintiff's subjective reports of pain without significant objective findings, and his own observations of Plaintiff's sub-maximal effort during the evaluation did not support the opinion.  The ALJ noted also that the opinion conflicted with treatment notes showing normal strength and range of motion and independent ambulation.[161]

Again, the ALJ did not evaluate PT Babb's opinion in the context of fibromyalgia and CRPS, particularly with respect to Plaintiff's bilateral hand pain.  Therefore, the ALJ's reasons for discounting PT Babb's functional capacity evaluation and opinion are not supported by substantial evidence.

---

[160] A.R. 1305–17.

[161] A.R. 37–38.

## C.     Scope of Remand

Plaintiff requests that the Court reverse the SSA's final decision and remand for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).[162]   When prejudicial error has occurred, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation[.]"[163]

As shown above, the ALJ's reasons for discounting Plaintiff's testimony were not supported by clear and convincing reasons and the medical opinions of PT Spillman and PT Babb were not supported by substantial evidence.  The vocational expert at Plaintiff's April 2022 hearing testified that limiting Plaintiff to occasional handling in the RFC would eliminate her ability to perform her past relevant work.   The vocational expert also provided examples of other work in the national economy that required minimal handling, reaching, and fingering.[164]   But the ALJ did not engage in a step five analysis.[165] Consequently, there are outstanding issues that must be resolved before a determination of disability can be made.

Therefore, the proper remedy in this case is to remand for further administrative proceedings.  On remand, the ALJ should consider Plaintiff's testimony and the medical evidence in light of SSR 12-2p and SSR 03-2p, particularly for Plaintiff's bilateral hands, and conduct any further necessary proceedings consistent with this Decision and Order.

---

[162] Docket 11 at 24.

[163] *Dominguez v. Colvin,* 808 F.3d 403, 407 (9th Cir. 2015) (quoting *Treichler,* 775 F.3d at 1099).

[164] A.R. 75–77.

[165] A.R. 39.

Case No. 3:23-cv-00155-SLG, *Denise M. v. O'Malley*
Decision and Order
Page 36 of 37

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and are not supported by substantial evidence.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 11 is GRANTED.  The Commissioner's final decision is REVERSED and REMANDED for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) and consistent with this Decision and Order.  The Court directs the Clerk of Court to enter judgment in favor of Plaintiff and close this case accordingly.

DATED this 25th day of June 2024, at Anchorage, Alaska.

*/s/  Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE